Stephen J. Kane (*pro hac vice*)
stephen.kane@cityofchicago.org
City of Chicago Department of Law
121 North LaSalle Street, Room 600
Chicago, IL 60602
Tel: (312) 744-6934
Fax: (312) 744-5185

Jimmy R. Rock (*pro hac vice*)
jrock@edelson.com
EDELSON PC
1255 Union St. NE, 7th Floor
Washington, DC 20002
Tel: (202) 270-4777
Fax: (312) 589-6378

Shantel Chapple Knowlton (*pro hac vice*)
schappleknowlton@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378

*Attorneys for Plaintiff City of Chicago*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: KIA HYUNDAI VEHICLE THEFT LITIGATION<br><br>This Document Relates to:<br><br>*City of Chicago v. Kia America, Inc., and Hyundai Motor America*, Case No. 8:23-cv-02045-JVS(KESx) | Case No. 8:22-ML-3052-JVS(KESx)<br><br>The Honorable James V. Selna<br><br>**SECOND AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## <u>SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiff City of Chicago (the "City" or "Chicago") brings this action against Defendants Kia America, Inc. ("Kia") and Hyundai Motor America ("Hyundai").[1]

### INTRODUCTION

1.      Unlike the movies, hot-wiring vehicles is far harder than it appears—unless that vehicle was manufactured by Hyundai or Kia.

2.      For years, automakers Kia and Hyundai chose to forego (often simple) industry-standard, anti-theft technologies in many of their cars. As soon as people discovered their shortcomings, videos showing how to "hot-wire" these cars went viral on the Internet. Not surprisingly, thefts of Kia and Hyundai vehicles skyrocketed at record-setting rates in cities throughout the United States, including in Chicago. This rise in thefts led to a rise in reckless driving, motor vehicle accidents, violent crimes, injuries, and property damage.

3.      Unfortunately, this critical defect in Hyundai and Kia vehicles could have been easily prevented. Most car manufacturers in the United States began introducing engine immobilizers as standard anti-theft equipment over a decade ago. Essentially, an electronic engine immobilizer is a security technology that functions by requiring a smart key with a special chip that sends an encrypted signal to start the car. Unlike nearly every other major car manufacturer, however, Kia and Hyundai failed to install this critical anti-theft technology or any equivalent anti-theft technology in most of the vehicles they sold in the United States between 2011 and 2022, all while touting their vehicles as having "advanced" technology and safety features.

4.      Kia and Hyundai knew that engine immobilizers were effective at

---

[1]      Pursuant to a stipulation with Defendants, Chicago voluntarily dismissed Defendants Hyundai Motor Company and Kia Corporation without prejudice. (*See* Dkt. No. 292.) Chicago therefore removed those Defendants in this second amended complaint. That removal is not intended by Chicago to modify any of the terms of the stipulated dismissal.

preventing car theft. Kia and Hyundai had the capability to provide immobilizers, as they were routinely installing them as standard equipment in vehicles sold outside the United States. Both companies also knew that failing to install immobilizers or equivalent anti-theft technology would increase crime and threaten public safety. Yet they failed to install them. Moreover, they failed to clearly disclose this lack of industry-standard or equivalent anti-theft technology to consumers. With this information not readily available without such a disclosure, thousands of Chicago consumers unknowingly bought Hyundai and Kia vehicles that were highly susceptible to theft and have been left to pay thousands of dollars in costs to replace and/or repair stolen vehicles and increased insurance premiums.

5.    Kia's and Hyundai's unlawful and reckless actions have caused a car theft crisis. In 2022, more than 8,800 Kia and Hyundai vehicles were stolen in Chicago alone. This figure represented 41% of Chicago's car thefts, even though Kia and Hyundai vehicles made up just 7% of the vehicles. Unfortunately, that trend continued into 2024, with Hyundai and Kia vehicles consistently accounting for more than 40% of all vehicles stolen in Chicago.

6.    The surge in thefts has hit Chicago especially hard—placing pedestrians, drivers, and bystanders in harm's way. This crime wave has also further stressed Chicago's law enforcement and emergency services. Chicago is bearing the cost of Defendants' unlawful conduct, as it pays for property damage, diverts law enforcement resources, and strives to keep the public safe from harm that Defendants could have prevented. Through this lawsuit, Chicago seeks to shift those costs back to Defendants and hold Defendants accountable for their misrepresentations and material omissions to Chicago consumers.

## PARTIES

7.    Plaintiff City of Chicago is a municipal corporation and a home-rule

1  unit organized and existing under the laws of the State of Illinois.[2]

2      8.    Defendant Hyundai Motor America is a manufacturer and distributor of

3  motor vehicles under the Hyundai brand and is incorporated and headquartered in

4  the State of California. Its headquarters is located at 10550 Talbert Avenue,

5  Fountain Valley, California. Hyundai Motor America distributes, markets, leases,

6  warrants, and oversees regulatory compliance and warranty servicing of Hyundai

7  brand vehicles through a network of over 800 dealers throughout the United States

8  from its headquarters in California. Hyundai has dealerships in Chicago. On

9  information and belief, Hyundai Motor America is directly and materially involved

10  in the manufacture and design of vehicles and in developing and disseminating

11  promotional and advertising materials for Hyundai vehicles to United States

12  consumers, including consumers in Chicago.

13      9.    Defendant Kia America, Inc. is a manufacturer and distributor of new

14  motor vehicles under the Kia brand and is incorporated and headquartered in the

15  State of California. Its principal place of business is located at 111 Peters Canyon

16  Road, Irvine, California. Kia America, Inc. markets, leases, warrants, and oversees

17  regulatory compliance and warranty servicing of Kia-brand vehicles through a

18  network of over 700 dealers throughout the United States from its headquarters in

19  California. Kia has a dealership in Chicago. On information and belief, Kia

20  America, Inc. is directly and materially involved in the manufacture and design of

21  vehicles and in developing and disseminating promotional and advertising materials

22  for Kia vehicles to United States' consumers, including consumers in Chicago.

23

24

_____

25  [2]    Following an investigation, Kenneth J. Meyer, Commissioner for the City of

26  Chicago Department of Business Affairs and Consumer Protection, determined that Defendants engaged in practices prohibited by Section 2-25-090 of the Municipal

27  Code of Chicago ("MCC"), and subsequently requested that the City of Chicago Department of Law bring legal action against Defendants seeking all available

28  relief.

**JURISDICTION AND VENUE**

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the amount in controversy exceeds $75,000 and there is complete diversity between the parties. The City of Chicago is a citizen of the State of Illinois for purposes of diversity jurisdiction. Defendants Hyundai and Kia are citizens of the State of California, where they are headquartered and incorporated.

11.     Chicago originally filed this action in state court in Cook County, Illinois. This action was then removed to the United States District Court of the Northern District of Illinois. Pursuant to the Transfer Order issued by the United States Judicial Panel on Multidistrict Litigation the action was then transferred to this multidistrict litigation pending in the United States District Court for the District of Central California. (Dkt. No. 260.) Chicago maintains its Home Venue is the United States District Court of the Northern District of Illinois.

12.     This Court has general personal jurisdiction over Hyundai and Kia because they are incorporated and headquartered in the State of California. This Court also has specific personal jurisdiction over Defendants because they conduct significant business in this District, some of the unlawful conduct alleged herein occurred in and/or emanated from this District, and the Defendants have their principal places of business in this District.

13.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the Complaint occurred in this District.

**FACTUAL ALLEGATIONS**

**A.     Hyundai and Kia Became Two of the Most Popular Vehicle Manufacturers in the United States.**

14.     Hyundai started selling vehicles in the United States in 1986. Kia first began selling cars in the United States in 1992. Since that time Hyundai and Kia have grown into two of the most popular and recognizable car brands in the United States. From 2010 to 2022 Hyundai and Kia's car sales in the United States grew

-4-

from 894,300 to 1,451,594.

15.     Hyundai Motor Company was initially a majority stakeholder in Kia, until it divested a portion of its interest in the 2000s. It now controls approximately one-third of Kia Corporation. However, Hyundai and Kia remain closely connected.

16.     As one example of those remaining close connections, Hyundai and Kia vehicles share many of the same component parts and are worked on by the same group of engineers at the Hyundai America Technical Center, Inc. ("HATCI"). HATCI is an authorized representative for Hyundai and Kia when dealing with the National Highway Traffic Safety Administration ("NHTSA"). Additionally, many Hyundai and Kia vehicles share the same underlying engineering, although they may differ in style and cosmetic touches. For this reason, when certain parts are recalled for Hyundai vehicles, they are often recalled for Kia vehicles as well.

17.     Kia and Hyundai both have dealerships in Chicago and marketed and sold vehicles to Chicago consumers. From 2011 through 2022, Defendants marketed and sold vehicles that did not include industry-standard or equivalent anti-theft equipment to Chicago consumers.

**B.     Hyundai and Kia Failed to Install Industry-Standard Engine Immobilizers or Equivalent Technology.**

18.     In 1919, St. George Evans and Edward B. Birkenbeuel invented the "Automobile-Theft Preventer," the first electric immobilizer/vehicle security system. The immobilizer/alarm system consisted of a three-by-three switch panel that connected the car's battery, ignition, and horn. When exiting the vehicle, the driver could turn switches on the panel to divert electricity from the ignition to the horn when an unauthorized person attempted to start the vehicle.

19.     The timing of this first immobilizer technology coincided with Congress's enactment of the National Motor Vehicle Theft Act, 18 U.S.C. § 2311 *et seq.*, which was enacted to response to the growing number of automobile thefts around the country. In 1966, Congress passed the National Traffic and Motor

-5-

Vehicle Safety Act, which is overseen by NHTSA, a sub-agency of the Department of Transportation. NHTSA promulgates several federal motor vehicle safety standards ("FMVSS") including FMVSS 114, which requires certain minimal theft-protection standards for nearly all passenger vehicles in the United States.

20.　　FMVSS 114 provides in relevant part that "[e]ach vehicle must have a starting system which, whenever the key is removed from the starting system prevents: (a) [t]he normal activation of the vehicle's engine or motor; and (b) [e]ither steering, or forward self-mobility, of the vehicle, or both." 49 C.F.R. § 571.114.

21.　　An industry-standard engine immobilizer is the easiest way to satisfy this requirement "because it locks out the engine control module if an attempt is made to start the vehicle without the correct key or to bypass the electronic ignition system."[3]

22.　　In response to the growing problem of vehicle thefts in the early 1990s, automobile manufacturers began installing passive engine immobilizers, patented in 1993. Unlike the Automobile-Theft Preventor of 1919, these devices make a car engine operable only if the correct key having coded information is used rather than relying on concealed switches. These passive engine immobilizers prevented hot-wiring by ensuring that a car would not start if the key was not present—whether or not the ignition was turned or bypassed.

23.　　These new engine immobilizers proved effective, and starting in the late 1990s, several jurisdictions began mandating all new passenger cars have electronic engine immobilizers installed, including the European Union, Canada, New Zealand, and Australia. By the 2010s, immobilizers had become standard

---

[3]　　Jacqueline Glassman, *Interpretation ID: GF005229-2*, NHTSA (Sept. 24, 2004), https://www.nhtsa.gov/interpretations/gf005229-2#:~:text=This%20responds%20to%20your%20letter,114%2C%20Theft%20Protection.

equipment for almost every automobile manufacturer in the United States—except
for Hyundai and Kia.



**Figure 1: Engine Immobilizers in US Vehicles[4]**

24.    Engine immobilizers became industry-standard equipment because, as
research supports, they are effective in curbing vehicle theft. For example, the
Highway Loss Data Institute ("HLDI") found "that vehicle theft losses decreased
significantly after factory-installed passive immobilizing antitheft devices were
introduced."[5] One study confirmed that immobilizers lowered the overall rate of car
theft by roughly 50% from 1995 to 2008.[6] By 2019, the annual rate of car thefts had
fallen about 67% from its peak in 1991.

---

[4]    Highway Loss Data Institute, Vol. 38, Bulletin No. 28 (Dec. 2021),
https://www.iihs.org/media/0e14ba17-a3c2-4375-8e66-
081df9101ed2/opm7QA/HLDI%20Research/Bulletins/hldi_bulletin_38-28.pdf.
[5]    *Id.*
[6]    Jan C. van Ours and Ben Vollaard, *The Engine Immobilizer: A Non-Starter
for Car Thieves*, 126 THE ECON. J. 593, 1264, 1283 (June 2013), available at
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2202165.

-7-



**Figure 2[7]**

25.   Kia and Hyundai were aware of the evidence and knew engine immobilizers were effective, too. For example, in 2007, Hyundai argued that its Azera—a luxury model, and one of few that included an immobilizer—should be exempt from another anti-theft regulation because the immobilizer was an equally if not more effective method of deterring and preventing theft. As part of the slew of evidence that Hyundai presented to NHTSA to support its request for an exemption, "Hyundai stated that the data shows a dramatic reduction of theft rates due to the introduction of devices substantially similar to the Hyundai immobilizer device."[8] Hyundai's pitch was convincing—NHTSA granted the exemption, finding that Hyundai "provided adequate reasons for its belief that the [immobilizer] will reduce and deter theft."[9]

26.   Despite knowing that engine immobilizers were effective, and decades of evidence supporting this conclusion, Kia and Hyundai nonetheless chose to only include the device on their luxury models. This was the case even though including engine immobilizers on all their models was not cost-prohibitive. Including the

---

[7]    Greg Rosalsky, *Planet Money, Someone stole my truck. I got a crash course on the wild black market for stolen cars*, NPR (Aug. 23, 2022), https://www.npr.org/sections/money/2022/08/23/1118457271/someone-stole-my-truck-i-got-a-crash-course-on-the-wild-black-market-for-stolen-cars.

[8]    72 Fed. Reg. § 39662 (July 19, 2007).

[9]    *Id.*

technology would only have cost Hyundai and Kia a few hundred dollars per vehicle. Moreover, outside the U.S., both companies routinely installed immobilizers in *all* models of vehicles sold in the European Union and Canada.

27.     Kia and Hyundai manufactured and distributed the following automobile models without engine immobilizers or other equivalent technology between 2011 and 2022:

| Hyundai | Kia |
|---|---|
| 2011-2022 Accent | 2011-2021 Forte |
| 2011-2022 Elantra | 2021-2022 K5 |
| 2013-2020 Elantra GT | 2011-2020 Optima |
| 2013-2014 Elantra Coupe | 2011-2021 Rio |
| 2011-2012 Elantra Touring | 2011-2021 Sedona |
| 2011-2014 Genesis Coupe | 2021-2022 Seltos |
| 2018-2022 Kona | 2011-2022 Soul |
| 2020-2021 Palisade | 2011-2022 Sorento |
| 2011-2022 Santa Fe | 2011-2022 Sportage |
| 2013-2018 Santa Fe Sport | |
| 2019 Santa Fe XL | |
| 2011-2019 Sonata | |
| 2011-2022 Tucson | |
| 2012-2017, 2019-2021 Veloster | |
| 2020-2021 Venue | |
| 2011-2012 Veracruz | |

**Figure 3**[10]

28.     Collectively, the automobiles listed in Figure 3 are referred to throughout this Complaint as the "Defective Vehicles."

29.     Contradictory to Kia and Hyundai's representations that the Defective Vehicles included more advanced technology and safety features than comparable vehicles on the market, these vehicles were measurably less safe because they were easily stolen. Once this fact was spread on social media, thefts of Defective Vehicles ran rampant across the country.

---

[10]     *See Amended Settlement Agreement*, Dkt. No. 228-2 at 4 (Definition of "Class Vehicle[s]").

**C.    Kia and Hyundai Misrepresented the Safety and Quality of the Defective Vehicles and Failed to Disclose the Lack of Industry-Standard Anti-Theft Technology to Chicago Consumers.**

30.    From 2011 through 2022, both Hyundai and Kia made available to and/or directed advertisements and marketing materials to Chicago consumers that contained misrepresentations about the quality and safety of the Defective Vehicles and failed to clearly disclose the lack of industry-standard or equivalent anti-theft technology.

31.    Chicago makes the following specific misrepresentation/omission allegations with as much specificity as possible absent access to the information necessarily available only to Defendants:

32.    *Who*: Hyundai and Kia intentionally omitted and/or obfuscated the lack of industry-standard or equivalent anti-theft technology in the Defective Vehicles in advertisements disseminated and made available to and/or directed to Chicago consumers while simultaneously touting the quality and safety of the Defective Vehicles. Chicago is unaware of, and therefore unable to identify, the true names and identities of the specific individuals responsible for making such statements while concealing key material information.

33.    *What*: Defendants' advertisements and marketing materials for the Defective Vehicles highlighted the safety and other advanced features that were included as standard equipment but failed to expressly disclose the lack of engine immobilizers or equivalent anti-theft technology. Reasonable consumers would interpret representations about safety to encompass safety from theft.

34.    In most ads, Defendants did not mention engine immobilizers or equivalent anti-theft technology at all, much less disclose that the vehicles lack this industry-standard technology. Ads that mentioned immobilizers typically listed them as a feature in certain premium optional packages; these ads failed to clearly state that immobilizers were not included as standard equipment in certain, or in

-10-

some cases any, of the models. Such statements are not clear and conspicuous disclosures that would put Chicago consumers on notice of the lack of an engine immobilizer or other equivalent anti-theft technology in the Defective Vehicles.

35.    Defendants' failure to clearly disclose this fact was made more deceptive by Defendants' representations in their advertisements and marketing materials that the Defective Vehicles included more advanced technology and safety features than other comparable vehicles on the market.

36.    For example, in January 2017, Hyundai's webpage stated that "[y]ou can't overstate the importance of keeping the people you love safe, which is why we can't overstate the importance of always striving to make our safety features more advanced and innovative" and "[i]t's always been our aim to engineer the safest cars in the industry."[11] Similarly Kia's website states that Kia vehicles provide "[a] suite of advanced safety features designed to give you extra peace of mind," and that vehicles are "designed with advanced tech [and] premium features."[12]

37.    These same themes are seen in advertisements specific to the Defective Vehicles. As just one example, the brochure for the 2012 Kia Forte states that the Forte "has a comprehensive list of advanced safety systems. These safety features are standard equipment on every Forte."[13]

38.    In another example, the brochure for the 2015 Kia Sorento states that the "Sorento is equipped with technologically advanced features dedicated to enhance your driving experience."[14] The brochure goes on to state that Kia is

---

[11]    *Safety*, HYUNDAI, https://web.archive.org/web/20170128134234/ https://www.hyundaiusa.com/new-thinking/safety.aspx (archived Jan. 28, 2019).
[12]    *Why Kia*, KIA, https://www.kia.com/us/en/why-kia (last visited Apr. 9, 2024).
[13]    *2012.Kia.Forte*, KIA, at 3, https://www.auto-brochures.com/makes/Kia/Forte/Kia_US%20Forte_2012.pdf (last visited Apr. 9, 2024).
[14]    *2015 Sorento*, KIA, at 5, https://www.auto-brochures.com/makes/Kia/Sorento/Kia_US%20Sorento_2015.pdf (last visited Apr. 9, 2024).

-11-

committed to producing "world-class vehicles" that included "an extraordinary combination of precision engineering, outstanding performance, innovative features and advanced safety systems."[15] However, what this brochure fails to mention—even on the highly detailed Specifications and Features page—is that this vehicle did not include an engine immobilizer or equivalent anti-theft technology.[16]

39.    Similarly, Hyundai's brochure for the 2018 Accent represents to consumers that "the performance and safety features offered on the all-new Accent are beyond what you'd expect from a car in its class."[17] The ad then directs consumers to the list of safety features at the end of the brochure, which like the brochure for the 2015 Kia Sorento provides a long list of features that are included, but fails to expressly disclose that the 2018 Hyundai Accent does not include an engine immobilizer or other equivalent anti-theft technology.[18]

40.    In its 2016 Full Line brochure, Hyundai advertises that the 2016 Elantra is "filled with the sort of premium features you'd only expect to find on luxury cars" and that the 2016 Elantra included "performance, safety and communications technologies so advanced, it's capable of doing things beyond any compact car you've ever owned."[19] The Specifications and Features page likewise makes no mention of the vehicle's lack of an engine immobilizer or equivalent anti-theft technology.

41.    These are just four examples of Kia and Hyundai's deceptive advertising of the Defective Vehicles, but they are representative of similar

---

[15]    *Id.* at 10.
[16]    *Id.*
[17]    *2018 Hyundai Accent*, HYUNDAI, at 5, https://secure.viewer.zmags.com/publication/3a46a32c#/3a46a32c/1 (last visited Apr. 9, 2024).
[18]    *Id.* at 11.
[19]    *2016 Hyundai Full Line*, HYUNDAI, at 17, https://www.auto-brochures.com/makes/Hyundai/Hyundai_US%20Full_Line_2016.pdf (last visited Apr. 9, 2024).

advertisements, including brochures and other advertisements for the following models and model years of the Defective Vehicles that Chicago has reviewed: Kia Forte (2012-2020, 2022); Kia Rio (2011-2013, 2015-2020); Kia Soul (2012-2019, 2021-2022); Kia Sorento (2011-2022); Kia Sportage (2011-2020, 2022); Hyundai Elantra (2016-2022); Hyundai Elantra GT (2018-2019); Hyundai Accent (2011, 2018-2022); Hyundai Palisade (2020-2022); Hyundai Sonata (2016-2019); Hyundai Santa Fe (2016-2022); Hyundai Santa Fe XL (2019); Hyundai Tucson (2017-2021); Hyundai Venue (2020-2021); Hyundai Veloster (2016-2017, 2019-2020); and Hyundai Veracruz (2012).[20]

42.     The advertisements that Chicago reviewed showed a pattern and practice of Kia and Hyundai touting the Defective Vehicles as having some of the most advanced technology and safety features of vehicles on the market but failing to expressly and clearly disclose that these vehicles lacked engine immobilizers or equivalent anti-theft technology—even though that technology had become standard equipment in almost all other vehicles sold in the United States by 2011.

43.     Seventy-seven of the ninety-seven advertisements reviewed did not mention engine immobilizers or equivalent anti-theft technology at all.[21]

44.     In eleven of the twenty instances that an advertisement included the term "immobilizer," it was only in the small print listing for luxury optional packages.[22] These limited boilerplate disclosures were not clear and conspicuous and thus failed to put reasonable Chicago consumers on notice of the lack of an engine immobilizer or other equivalent anti-theft technology in the Defective Vehicles that did not include these luxury packages.

45.     Out of the ninety-seven advertisements reviewed, only nine listed immobilizers on the detailed specification and features page and either listed

---

[20]     *See* Exhibit A for a full list of advertisements that Chicago reviewed.
[21]     *Compare* Exhibit A with Exhibits B-C.
[22]     *See* Exhibit B for a list of the eleven advertisements.

immobilizers as a standard feature in only some models or only as a premium addition.[23]

46.  On information and belief, there are more advertisements and marketing materials for the Defective Vehicles not referenced here that contain substantially similar misrepresentations and omissions.

47.  **When**: Defendants made the foregoing misrepresentations and material omissions regarding the Defective Vehicles' lack of industry-standard or equivalent anti-theft technology in a substantial number of advertising and marketing materials disseminated and available to and/or directed to Chicago consumers for the Defective Vehicles from 2011-2022.

48.  **Where**: Defendants made the foregoing misrepresentations and material omissions regarding the Defective Vehicles' lack of industry-standard or equivalent anti-theft technology in a substantial amount of advertising and marketing materials disseminated and available to and/or directed to Chicago consumers for the Defective Vehicles from 2011-2022 including materials discussed above and, upon information and belief, print advertising, video advertisements, and materials made available to consumers at dealerships. On information and belief, such information was not disclosed in sales documents, displays, advertisements, warranties, owner's manuals, or on Defendants' websites for almost all of the Defective Vehicles. In the limited instances where "immobilizers" are mentioned in advertisements, the majority are not clear and conspicuous disclosures that those vehicles lacked immobilizers or equivalent anti-theft technology as standard equipment.

49.  Defendants easily could have clearly and conspicuously disclosed this information in the foregoing materials but chose not to.

50.  **How**: At the time the Defective Vehicles were advertised to and sold to

---

[23]  *See* Exhibit C for a list of the nine advertisements.

-14-

Chicago consumers, Defendants knew that the Defective Vehicles were measurably less safe and more susceptible to theft than almost every other vehicle on the market that did include an engine immobilizer or equivalent anti-theft technology. Despite that knowledge, Defendants omitted the lack of engine immobilizers or equivalent anti-theft technology in almost all their advertisements and marketing materials for the Defective Vehicles, while simultaneously touting those vehicles as having more advanced technology and safety features than other vehicles in their class. In the few instances that advertisements did include mention of "immobilizers," the majority were not a clear and conspicuous disclosures that those vehicles lacked immobilizers or equivalent anti-theft technology as standard equipment.

51.    Defendants knowingly left out or obfuscated information about the lack of industry-standard or equivalent anti-theft technology that would impact consumers' decisions to purchase the Defective Vehicles. Defendants intended that consumers rely on their deceptive advertising materials in determining whether to purchase the Defective Vehicles. On information and belief, Defendants intended that consumers rely on misleading statements and omissions in their deceptive advertising in order to sell more vehicles to consumers, including consumers in Chicago, without regard to the harms they would cause consumers.

52.    Omitting and/or failing to clearly and conspicuously disclose this information rendered Defendants' statements that the Defective Vehicles included more advanced technology and safety features than other vehicles in their class misleading half-truths that would deceive a reasonable consumer in a material respect. Absent a clear and conspicuous disclosure, a reasonable consumer would believe that Hyundai's and Kia's representations regarding advanced technology and safety features included anti-theft technology.

53.    The fact that the Defective Vehicles lacked technology that made them demonstrably easier to steal than other vehicles on the market would be important to a reasonable consumer, and the failure to clearly and conspicuously disclose that

-15-

1  fact was a material omission.

2      54.  **Why:** Defendants omitted material information and included

3  misleading half-truths about the Defective Vehicles' advanced technology and

4  safety features for the purpose of inducing consumers, including Chicago

5  consumers, to purchase and/or lease the Defective Vehicles. Without an express

6  clear and conspicuous disclosure in Defendants' advertisements and marketing

7  materials, Chicago consumers had no reasonable way of learning that the Defective

8  Vehicles were more susceptible to theft than other vehicles on the market.

9      55.  Thousands of Chicago consumers bought Defective Vehicles from

10  Defendants; on information and belief, many did so at dealerships in Chicago. On

11  information and belief, Chicago consumers were exposed to the Defendants'

12  deceptive advertisements, which Defendants widely disseminated. As discussed in

13  more detail below, thousands of these consumers have had their Defective Vehicles

14  stolen and have incurred substantial costs to replace and/or repair the Defective

15  Vehicles. Many consumers have also seen their insurance premiums increase

16  because of the lack of engine immobilizers or equivalent anti-theft technology.

17      56.  A substantial number of Chicago residents have suffered substantial

18  injury due to Defendants' failure to include industry-standard or equivalent anti-

19  theft technology in the Defective Vehicles. Moreover, Defendants intentionally

20  denied consumers information necessary for them to meaningfully choose to avoid

21  this injury by, in most instances, intentionally omitting that the Defective Vehicles

22  lacked anti-theft technology and, in others, failing to clearly and conspicuously

23  disclose this fact. A reasonable consumer would not otherwise have access to this

24  critical information absent a clear and conspicuous disclosure from Defendants.

25      57.  Chicago has received over one-hundred and thirty complaints from

26  Chicago consumers outlining the hardships that have been caused by Defendants'

27  deceptive and unfair trade practices.

28      58.  Consumer T.E. stated that after her 2019 Kia Forte was stolen, she had

to wait months for a repair shop to take her vehicle because repair shops were refusing to accept her vehicle due to part shortages and liability from having the vehicle on their lot. During the months that the consumer was not able to use her vehicle, she still had to pay her car payment and her now increased insurance rates. She was even left continuing to make her car payment after trading the vehicle in because the value of the vehicle had dropped to below the value of the outstanding amount on her loan.

59.     Consumer E.D. had her 2020 Hyundai Electra stolen on the day of a family member's funeral. After her car was stolen, it took her two months to obtain alternative transportation, during which she was left without transportation to get to work, and her family had to walk to get groceries and other necessities. During the time she did not have her vehicle, the consumer had to continue paying her car payment.

60.     Consumer H.C., age 73, had her 2020 Hyundai Tuscan stolen three separate times from the parking lot at her senior living community, including at least one time from a handicap parking spot. Although her vehicle was recovered each time, it was badly damaged, and the consumer is on a fixed income and could not afford to fix it. In a news story about her stolen vehicle, the consumer states that the dealership "should not have let me get out of there without that safety feature" (i.e., anti-theft technology).[24]

61.     Even consumers who have not had their cars stolen are experiencing hardship. Consumer M.P. stated that she lives in fear each day that her Kia will be stolen because of the theft crisis, and she is struggling to pay her increased insurance premiums.

---

[24]     Megan Hickey, *Thieves Steal Woman's Hyundai Three Times from Same CHA Parking Lot*, CBS News (Aug. 24, 2024), https://www.cbsnews.com/chicago/news/stolen-hyundai-tucson-cha-patrick-sullivan-senior-apartments/.

-17-

62.     Some, if not all, of Chicago consumers would not have bought or leased the Defective Vehicles had they been informed that the Defective Vehicles were demonstrably easier to steal than almost all other vehicles on the market. Had Chicago consumers not bought the Defective Vehicles, there would have been fewer Defective Vehicles in Chicago to steal. The costs that Chicago has incurred to provide services related to the theft crisis of Defective Vehicles would also have been less had there been fewer Defective Vehicles in Chicago. The costs Chicago has incurred are reasonably related to Defendants' deceptive and unfair advertising and sale of the Defective Vehicles to Chicago consumers.

**D.**     **Kia's and Hyundai's Failure to Include Engine Immobilizers or Equivalent Technology in the Defective Vehicles Caused a Theft Crisis in Chicago.**

63.     Pushing thousands of cars onto the market without immobilizers or equivalent anti-theft technology, and without disclosing this defect to customers, led to an all-too-predictable outcome: thefts of Defective Vehicles skyrocketed.

64.     Specifically, Kia and Hyundai thefts exploded in the summer of 2022 when social media users began posting "how-to" videos depicting how easy it was to steal the Defective Vehicles because they lacked engine immobilizers or equivalent anti-theft technology. Videos quickly went viral, showing how a thief need only remove the plastic cover (called a cowl) under the steering column and use a USB cable to start the stolen vehicle. This prompted a wave of teens and young adults, often dubbed the "Kia Boyz," to start filming themselves and others engaging in reckless driving and other criminal behavior after stealing Defective Vehicles. Soon, almost half of all cars stolen in many cities were a Kia or Hyundai.

65.     This theft crisis hit Chicago particularly hard. In August 2022, the Chicago Police Department's 15th District announced in a community advisory that,

"vehicle theft is up an astounding 767% due to an emerging TikTok challenge."[25] In
October 2022, Chicago set a new record—more than 3,100 vehicles were stolen, the
most in any month in the past 20 years. By the year's end, Chicago had experienced
a 55% increase in vehicle thefts—up more than any other city in the U.S.

66.    This rise in vehicle thefts is largely attributable to a massive surge in
stolen Kias and Hyundais. More than 500 Kia or Hyundai were reported stolen in
the first half of 2022; over the second half, the number had skyrocketed to over
8,350. In December 2022 alone, Kia and Hyundai made up 60.9% of the 2,700-
plus car thefts in Chicago that month.




**Figure 4**[26]                    **Figure 5**[27]

67.    Although Kias and Hyundais only make up approximately 7% of the
vehicles in Chicago, they accounted for 41% of stolen vehicles in 2022—a total of
over 8,800 thefts. That amounts to about 11% of the City's 36,300 registered Kia
and about 8% of the City's 53,500 Hyundais being stolen that year.

---

[25]    Audrey Conklin, *TikTok car theft challenge: Chicago area sees 767%
increase in Hyundai, Kia thefts*, N.Y. POST (Aug. 25, 2022),
https://nypost.com/2022/08/25/chicago-area-sees-increase-in-hyundai-kia-thefts-
due-to-tiktok/.
[26]    Elliot Ramos and Brad Edwards, *More than 7,000 Kias and Hyundais have
been stolen in Chicago this year, hitting South and West sides the hardest*, CBS
NEWS CHI. (Dec. 14, 2022), https://www.cbsnews.com/chicago/news/kia-hyundais-
stolen-chicago/.
[27]    *Id.*



**Figure 6**[28]

68.    Unfortunately, the thefts show no signs of slowing. In 2023, Kia and Hyundai vehicles continued to account for more than 50% of vehicles stolen in the City. In January 2023, Kia and Hyundai vehicles accounted for 60.3% of all vehicles stolen in Chicago. In July 2023, Kia and Hyundai vehicles continued to account for 54.3% of all stolen vehicles, with over 1,300 Kia and Hyundai vehicles stolen that month alone.

69.    By the beginning of October 2023, Chicago already had more automobile thefts in 2023 than it had in any of the past 19 years, with Hyundai and Kia vehicles accounting for almost half of the vehicles stolen.

70.    As detailed further below, the crimes do not end with the theft of these motor vehicles: the individuals responsible for these crimes often engage in further criminal misconduct that create public safety issues, including but not limited to reckless driving, additional armed robberies, and even deaths.

---

[28]    *Car thefts are rising. Is a TikTok challenge to blame?*, USA FACTS (Mar. 26, 2023), https://usafacts.org/data-projects/car-thefts.

**E.      Defendants' Failure to Include Engine Immobilizers or Equivalent Anti-Theft Technology Has Disproportionately Impacted Low-Income Chicago Residents.**

71.      Chicago's residents have been deeply impacted by the Kia and Hyundai theft crisis, whether or not they personally own the Defective Vehicles. Individual owners suffer financial harm when their Defective Vehicles are stolen, damaged, and vandalized. Victims of vehicle theft have expressed frustration at the significant out-of-pocket costs and impacts on their daily lives. Even if theft victims are lucky enough to have their Kia or Hyundai recovered by police and returned, they are almost always ransacked, damaged, or totaled altogether. One Chicagoan even had her 2019 Kia Optima stolen twice in one day—after police found the car damaged, they took it to an auto repair shop, and it was stolen *again* later that day.[29]

72.      Another owner, a single mother, had her 2021 Kia Forte stolen in October 2022.[30] Police found the vehicle—trashed but not totaled—and repairs were anticipated to take until springtime to complete due to a backlog in replacement parts. She was left paying $1,500 per month out-of-pocket for a rental car since her insurance only covered 30 days. Meanwhile, she still owes Kia her $400 monthly payment, which Kia refused to budge on despite the circumstances.

73.      Because the Defective Vehicles are entry-level models and relatively low priced, the impact of the surge in car theft is being felt disproportionally among communities of moderate and low means. The Chicago neighborhoods hardest hit by the surge in Kia and Hyundai thefts—Austin, South Shore, and the West Side—are also some of the lowest-income areas in the City. These theft victims and their families are often reliant on that single vehicle and have fewer resources to pay for

---

[29]      Ramos & Edwards, *supra*, n.26.

[30]      Tara Molina, *Chicago woman's Kia will be under repair until spring after stolen, found -- and she's stuck with all the bills*, CBS NEWS CHI. (Dec. 16, 2022), https://www.cbsnews.com/chicago/news/chicago-kia-theft-insurance-bills/.

alternative transportation or repair a recovered vehicle. Because many rely on their vehicles to get to work, medical appointments, or fetch groceries for their kids, they risk losing their jobs and worse.

74.     Costs for repairing broken windows, steering columns, and other damage often exceed $10,000. And even if Kia and Hyundai owners can afford those repairs, they have been delayed days or weeks because the rise of thefts has created a backlog for replacement parts.

75.     Even owners of Defective Vehicles who have been lucky enough not to have their cars stolen are suffering. As a result of the Kia and Hyundai theft crisis, major insurers including Allstate and Progressive have refused to insure the models most susceptible to theft. Meanwhile owners with existing policies have seen insurance prices for their Kias and Hyundais increase by $200 per year, if not more.

76.     Kia and Hyundai marketed the Defective Vehicles as having more advanced technology and safety features than comparable vehicles on the market, knowing the Defective Vehicles lacked industry-standard anti-theft equipment that made them more susceptible to theft. Defendants had every reason to know that their vehicles could be easily stolen without engine immobilizers or equivalent anti-theft technology but intentionally omitted that fact in the majority of their advertising and marketing materials. These unlawful misrepresentations and omissions have left thousands of Chicago's most vulnerable residents with unsafe and, in some cases, uninsurable vehicles.

**F.     Defendants' Failure to Include Immobilizers or Equivalent Technology Drains the City's Law Enforcement and Emergency Response Resources and Imperils Public Safety.**

77.     Harms to individual owners are just the beginning. Cars operated by unauthorized persons are more likely to cause accidents, personal injury, and death. When NHTSA promulgated the FMVSS in 1971, it included FMVSS 114, addressing theft protection. In promulgating the Federal Motor Vehicle and Safety

-22-

Standard 114, NHTSA recognized that car theft has significant impacts on public safety, concluding that "stolen cars constitute a major hazard to life and limb on the highways."[31]

78.    According to NHTSA, "evidence shows that cars operated by unauthorized persons are far more likely to cause unreasonable risk of accident, personal injury, and death than those which are driven by authorized individuals."[32] The NHTSA Administrator also concluded that "a reduction in the incidence of auto theft would make a substantial contribution to motor vehicle safety," by reducing both injuries and deaths to would-be car thieves, and by "protect[ing] the many innocent members of the public who are killed and injured by stolen cars each year."[33]

79.    Unfortunately, the reverse is also true. An *increase* in the incidence of automobile theft results in a substantial decrease in public safety. Car theft results in reckless driving, which poses a risk to both the operators of the stolen vehicles and any lawful users of the public thoroughfare who are unfortunate enough to cross paths with them. Thieves commonly use stolen vehicles to commit further crimes.

80.    The risks are even more heightened with the new wave of Kia and Hyundai car thefts. In contrast to car thefts where the object is to convert the stolen vehicles without being caught, Kia and Hyundai theft often involves teens and young adults who steal cars to post videos of themselves recklessly joyriding or using the cars to commit other crimes. The car thefts and associated videos often take place during busy hours of the day when roads are more congested. As a result, there is a higher likelihood of injury and even death.

81.    These risks are far from hypothetical. In February 2023, NHTSA

---

[31]    33 Fed. Reg. 6471 (April 27, 1968), https://archives.federalregister.gov/issue_slice/1968/4/27/6469-6472.pdf#page=3.
[32]    *Id.*
[33]    *Id.*

reported that this new social media trend had already resulted in at least 14 car
crashes and 8 fatalities.[34] Two 14-year-old boys were killed and another injured after
they crashed a stolen Hyundai Sonata.[35] Pedestrians have also been killed by stolen
Defective Vehicles. And victims of stolen Kia and Hyundai vehicles face violence
when they try to confront culprits. One woman who intervened in a theft in progress
was killed.[36]

82.    Chicago has been one of the cities hit hardest by this violence.
According to the Chicago Police Department ("CPD"), criminals used stolen
Hyundais in more than a dozen murders from October 2022 through January 2023.

83.    More recently, four people used a stolen Hyundai to commit a series of
crimes that ended with the murder of CPD Officer Areanah Preston.[37]

84.    In April 2023, a 6-month-old was killed in Chicago after a stolen
Hyundai blew through a red light at top speed and struck the pickup truck the baby's
mom was driving.[38] The Hyundai thieves were 14 and 17 years old.

85.    In another incident, a stolen Hyundai burst into flames after slamming

---

[34]    *Hyundai and Kia Launch Service Campaign to Prevent Theft of Millions of
Vehicles Targeted by Social Media Challenge*, NHTSA (Feb. 14, 2023),
https://www.nhtsa.gov/press-releases/hyundai-kia-campaign-prevent-vehicle-theft.
[35]    Dean Narciso and Zaria Johnson, *Two 14-year-old boys killed in overnight
crash involving stolen car, another hospitalized*, THE COLUMBUS DISPATCH (July
25, 2023), https://www.dispatch.com/story/news/crime/2022/07/25/adult-and-
juvenile-were-killed-crash-involving-stolen-car/10142235002/.
[36]    Michele Fiore, *13-year-old charged as adult in deadly Wauwatosa hit-and-
run*, CBS 58 (Oct. 20, 2021), https://www.cbs58.com/news/13-year-old-charged-as-
adult-in-deadly-wauwatosa-hit-and-run.
[37]    John Dodge, *Chicago Police Officer Areanah Preston murder: A timeline of
the case*, CBS NEWS CHI. (May 10, 2023),
www.cbsnews.com/chicago/news/chicago-police-officer-areanah-preston-murder-a-
timeline-of-the-case/.
[38]    Cate Cauguiran, *Family seeks upgraded charges for 2 teens after baby killed
in West Garfield Park stolen car crash*, ABC7 CHI. (Apr. 24, 2023),
https://abc7chicago.com/cristian-uvidia-west-garfield-park-chicago-crash-kim-
foxx/13181868/.

into the back of a City-owned sanitation truck around 10:45 am.[39] The vehicle was suspected to be involved in a string of five armed robberies earlier that morning. One victim said she was walking to her car with her friends when several men got out of a car and demanded their purses at gunpoint. One of the robbers pistol-whipped the victim in the face.

86.     On August 1, 2023, Chicago news outlets reported that a rideshare driver was robbed at gunpoint, with shots fired and his vehicle stolen.[40] The stolen Hyundai Sonata was then reportedly used in at least eight armed robberies.

87.     As recent as August 7, 2023, it was reported that five incidents of armed robbery occurred using stolen Kias and Hyundais in just one night.[41]

88.     The Kia and Hyundai theft crisis has translated into heightened demands on the City of Chicago's police force and other public safety resources. Chicago has been left to combat the thefts, related crimes, and respond to property damage and injuries to the public. In addition to responding to and investigating thefts, Chicago will have to continue to expend resources on public awareness outreach, as well as bear the costs associated with increased rates of reckless driving, car accidents, and resulting fatalities.

89.     According to CPD Patrol Chief Brian McDermott, these stolen cars are continually being used at an alarming rate in violent crimes, including homicides.

---

[39]     Mugo Odigwe and Andrew Ramos, *Car believed tied to at least one armed robbery crashes, catches fire in Lincoln Square; 4 in custody*, CBS NEWS CHI. (Dec. 12, 2022), https://www.cbsnews.com/chicago/news/armed-robberies-north-side/.

[40]     *Rideshare driver among 8 robbed by armed men in stolen Hyundai; shots fired*, CWB CHI. (Aug. 1, 2023), https://cwbchicago.com/2023/08/stolen-hyundai-used-eight-robberies-shots-fired-chicago-rideshare.html.

[41]     ABC7 Chicago Digital Team, *Chicago police: At least 5 victims targeted in North Side armed robbery spree*, ABC7 NEWS (Aug. 8, 2023), https://abc7chicago.com/chicago-armed-robberies-robbery-crime-crimes/13616985/?ex_cid=TA_WLS_TW&taid=64d216dda74c5f0001789ba3&utm_campaign=trueAnthem%3A+Trending+Content&utm_medium=trueAnthem&utm_source=twitter.

CPD has invested time and resources in getting theft prevention education and devices out to the community, including tracking tags and steering wheel locks. The City has also reimbursed owners of the Defective Vehicles for the cost of GPS tracking devices for the cars, which assist with police investigations and recovery efforts.

90.     Despite the City's best efforts, the nuisance of the Kia and Hyundai theft crisis continues. The Kia and Hyundai theft crisis and the costs incurred by Chicago were foreseeable outcomes that Defendants could have prevented had they simply chosen to make the same investment as other manufacturers—and indeed the same one they made in overseas markets—and include engine immobilizers or equivalent anti-theft technology as standard equipment in the Defective Vehicles.

**G.     Defendants' Response to the Theft Crisis Has Been Woefully Inadequate.**

91.     To date, Defendants' response to the crisis has shown a continued prioritization of profits over safety. After Illinois Attorney General Kwame Raoul and 21 other state Attorneys General urged Kia and Hyundai to take "comprehensive action" over car thefts, the companies instead promised to provide wheel locks for municipalities to distribute and began rolling out "software updates," rather than recalling the vehicles to install engine immobilizers or equivalent anti-theft technology.

92.     Moreover, Kia and Hyundai failed to timely provide steering wheel locks to Chicago. CPD asked Hyundai to provide steering wheel locks that CPD could distribute to Hyundai owners in the City. Hyundai provided fewer than 20 locks by the end of 2022, resulting in churches and local businesses donating locks to CPD instead.

93.     In January 2023, Chicago's Police Superintendent sent letters to Hyundai and Kia explaining the ongoing public safety crisis caused by the thefts and asking the companies to help address it by recalling or installing immobilizers in the

Defective Vehicles. Hyundai responded by asserting that their "software fix," discussed below, would remediate the problem going forward. But the software updates have failed to stymy the vehicle theft spree, as Hyundai promised.

94.    These band-aid solutions are too little, too late. The software update extends the length of the car alarm from 30 seconds to one minute and purportedly requires a key to be in the ignition to start the car. Hyundai notes that for its update to work, the consumer must lock their door with their key or the key fob button in order to set the factory alarm and activate the software's "ignition kill" feature.

95.    But these software updates' efficacy is untested in the real world. In fact, consumers who received the updates—which are still being rolled out—have already begun reporting that their Kia and Hyundai vehicles were stolen even *after* they received the software update. One owner had his 2020 Kia Optima stolen a mere fifteen hours after leaving the Kia dealership and receiving the update.[42] Police later found the vehicle, but it was totaled—the front end was smashed, rear window missing, steering column ripped apart, both airbags deployed, live ammunition in the center console, and, most notably, a USB port jammed into the steering column. A 2017 Hyundai Sonata owner had a similar experience.[43]

96.    As of July 2023, only approximately 15% of the eligible vehicles had received the software upgrade. Especially as thefts continue despite the software upgrades, consumers may be deterred from spending the time to visit a dealership to get the technology installed.

97.    Even if the software updates were rolled out widely, and proved

---

[42]    Devin Bartolotta, *First case of Kia stolen after security software upgrade reported in New Orleans*, WWL NEWS (May 15, 2023), https://www.wwltv.com/article/news/crime/first-case-kia-stolen-after-security-software-upgrade-reported-new-orleans-sweeps-crime-local-news/289-c789eed8-bc46-4e0a-83fb-7489563300ce.

[43]    Dave D'Marko, *Hyundai, Kia owners report thefts despite software upgrade*, FOX4 KANSAS CITY NEWS (May 17, 2023), https://fox4kc.com/news/hyundai-kia-owners-report-thefts-despite-software-upgrade/.

effective, they come too late to prevent the ongoing nuisance that the Defective Vehicles created and the expenses that Chicago has incurred and continues to incur. Further, it is not clear that the update will cover all models, and for those not covered, Defendants are offering nothing more than wheel locks or rebates for already purchased wheel locks. The reality is that the software update and wheel locks are not sufficiently slowing thefts in Chicago and thus do not address the harm caused by Defendants failing to include engine immobilizers or equivalent anti-theft technology as standard equipment.

98.    Kia's and Hyundai's software-based approach is yet another example of Defendants pursuing profits over safety. While less expensive than installing engine immobilizers, those savings come at the expense of efficacy and usability. Defendants have effectively passed safety costs on to Chicago, which is pouring resources into responding to thefts and associated crimes, educating the community, distributing anti-theft steering wheel locks, and reimbursing for GPS trackers installed on Defective Vehicles.

99.    Adding insult to injury, before all the negative publicity surrounding the theft crisis and prior to announcing the free software update, Hyundai tried to take advantage of the crisis it created by selling security kits for $170, plus the cost of installation. Defendants could have, and should have, initially included a fob-integrated engine immobilizer or equivalent anti-theft technology, consistent with the industry standard. Even after the Defective Vehicles were sold without this component, Defendants could have implemented a mandatory recall, as state Attorneys General have insisted. Instead, Hyundai chose to turn greater profits off the theft crisis it caused. Without Defendants taking more aggressive action to correct the problem they created, thefts of Kia and Hyundai vehicles have continued unabated.

**FIRST CAUSE OF ACTION**

**Violation of MCC 4-276-470**

**Deceptive Trade Practices**

100.    Chicago incorporates each preceding paragraph as though set forth fully.

101.    The acts and practices engaged in by Defendants, and described in this Complaint, constitute deceptive business practices in violation of the MCC § 4-276-470.

102.    MCC § 4-276-470 states that a person may not "act, use or employ any deception, fraud, false pretense, false promise or misrepresentation, or to conceal, suppress or omit any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . or advertisement of any merchandise, whether or not any person has in fact been misled."

103.    Kia and Hyundai are persons as defined by MCC § 1-4-090(e), which includes "any natural individual, firm, trust, partnership, association, joint venture, corporation or other legal entity."

104.    Defendants engaged in trade and commerce in Chicago by advertising the Defective Vehicles to Chicago consumers, which thousands of Chicago consumers purchased. On information and belief, a substantial number of Chicago consumers purchased the Defective Vehicles from dealerships in Chicago. On information and belief, a substantial number of Chicago consumers saw Defendants' deceptive advertisements and considered that information when deciding to purchase the Defective Vehicles.

105.    Defendants engaged in deceptive trade practices in violation of MCC § 4-276-470. Specifically, Defendants intentionally misrepresented that the Defective Vehicles included more advanced technology and safety features than comparable vehicles on the market. Defendants failed to clearly and conspicuously

-29-

disclose to consumers that the Defective Vehicles lacked an engine immobilizer or equivalent anti-theft technology. Defendants made the foregoing misrepresentations and omissions in their advertising intending to induce more consumers to buy the Defective Vehicles.

106.    Defendants' omission and/or obfuscation of the lack of industry-standard anti-theft technology was material because this information is the kind a buyer would be expected to rely on in deciding whether to purchase a vehicle, and a buyer who knew about the lack of industry-standard antitheft technology in the Defective Vehicles would have acted differently, such as not buying the vehicle.

107.    Defendants specifically placed profits ahead of the health and safety of others by intentionally omitting and concealing material facts about the Defective Vehicles' lack of engine immobilizer or equivalent technology and the ease with which they can be stolen.

108.    Under MCC § 4-276-480 "[e]ach violation of this section shall be considered a separate and distinct offense and shall be regarded as being committed on each day on which such person shall continue or permit any such violation." Each day that Defendants engaged and/or engages in deceptive marketing of the Defective Vehicles and/or sold and/or sells a Defective Vehicle to a Chicago consumer constitutes a separate and distinct offense of MCC § 4-276-470.

109.    WHEREFORE, Chicago respectfully requests that this Court enter an order (a) awarding judgment in the Chicago's favor on its First Cause of Action; (b) declaring that Defendants have violated MCC § 4-276-470; (c) enjoining Defendants from engaging in further deceptive practices in violation of MCC § 4-276-470; (d) assessing Defendants fines of $2,000 for each offense under MCC § 4-276-480; (e) awarding Chicago its costs of investigation and suit, including reasonable attorneys' fees and costs, to the extent allowable; (f) awarding Chicago pre- and post-judgment interest, to the extent allowable; and (g) awarding such other, further, and different relief as this Court deems reasonable and just.

**SECOND CAUSE OF ACTION**

**Violation of MCC § 2-25-090**

**Deceptive Trade Practices**

110.　Chicago incorporates each preceding paragraph as though set forth fully.

111.　MCC § 2-25-090 prohibits "any act of consumer fraud, unfair method of competition, or unfair or deceptive act or practice while conducting any trade or business in the city," including "[a]ny conduct constituting an unlawful act or practice under the Illinois Consumer Fraud and Deceptive Business Practices Act . . . or constituting a violation of . . . any other section of this Code relating to business operations or consumer protection."

112.　The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") makes unlawful, among other things, "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act.'" 815 ILCS 505/2.

113.　Section 2 of the Uniform Deceptive Trade Practices Act, 815 ILCS 510/2, provides that a person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person "represents that goods or services are of a particular standard, quality or grade" or "engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding." 815 ILCS 510/2.

114.　Defendants engaged in trade and commerce in Chicago by advertising and selling the Defective Vehicles to Chicago consumers, which thousands of Chicago consumers purchased. On information and belief, a substantial number of

-31-

1  Chicago consumers purchased the Defective Vehicles from dealerships in Chicago.

2  On information and belief, a substantial number of Chicago consumers saw

3  Defendants' deceptive advertisements and considered that information when

4  deciding to purchase the Defective Vehicles.

5      115.   Defendants engaged in deceptive trade practices in violation of MCC

6  § 2-25-090. Specifically, Defendants intentionally misrepresented that the Defective

7  Vehicles included more advanced technology and safety features than comparable

8  vehicles on the market. Defendants failed to clearly and conspicuously disclose to

9  consumers that the Defective Vehicles lacked an engine immobilizer or equivalent

10 anti-theft technology. Defendants made the foregoing misrepresentations and

11 omissions in their advertising intending to induce more consumers to buy the

12 Defective Vehicles.

13     116.   Defendants' omission and/or obfuscation of the lack of industry-

14 standard anti-theft technology was material because this information is the kind a

15 buyer would be expected to rely on in deciding whether to purchase a vehicle, and a

16 buyer who knew about the lack of industry-standard anti-theft technology in the

17 Defective Vehicles would have acted differently, such as not buying the vehicle.

18     117.   Defendants specifically placed profits ahead of the health and safety of

19 others by intentionally omitting and concealing material facts about the Defective

20 Vehicles' lack of engine immobilizer or equivalent anti-theft technology and the

21 ease with which they can be stolen.

22     118.   MCC § 2-25-090(h) provides that "[e]ach day that a violation continues

23 or occurred, and each violation committed per day, shall constitute a separate and

24 distinct offense to which a separate fine shall apply." Each day that Defendants

25 engaged or engage in deceptive marketing of the Defective Vehicles and/or sold

26 and/or sell a Defective Vehicle to a Chicago consumer constitutes a separate and

27 distinct offense of MCC § 2-25-090.

28     119.   WHEREFORE, Chicago respectfully requests that this Court enter an

order (a) awarding judgment in the Chicago's favor on its Second Cause of Action; (b) declaring that Defendants have violated MCC § 2-25-090; (c) enjoining Defendants from engaging in further deceptive practices in violation of MCC § 2-25-090; (d) awarding restitution for impacted consumers; (e) ordering disgorgement of profits Defendants obtained through their unlawful deceptive practices; (f) assessing Defendants fines of $10,000 for each offense under MCC § 2-25-090; (g) awarding Chicago its costs of investigation and suit, including reasonable attorneys' fees and costs; (h) awarding Chicago pre- and post-judgment interest, to the extent allowable; and (i) awarding such other, further, and different relief as this Court deems reasonable and just.

## THIRD CAUSE OF ACTION

### Violation of MCC § 2-25-090

### Unfair Trade Practices

120.   Chicago incorporates each preceding paragraph as though set forth fully.

121.   MCC § 2-25-090 prohibits "any act of consumer fraud, unfair method of competition, or unfair or deceptive act or practice while conducting any trade or business in the city," including "[a]ny conduct constituting an unlawful act or practice under the Illinois Consumer Fraud and Deceptive Business Practices Act . . . or constituting a violation of . . . any other section of this Code relating to business operations or consumer protection."

122.   The ICFA makes unlawful, among other things:

[u]nfair methods of competition and unfair or deceptive acts or practices . . . In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

815 ILCS 505/2.

123.    In determining whether an act or practice is unfair, the Federal Trade Commission considers the following factors which have been adopted by Illinois courts in interpreting the ICFA: (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (Ill. 2002).

> All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.

*Id.* at 418 (citation omitted).

124.    Defendants engaged in unfair trade practices in violation of MCC § 2-25-090. Defendants' conduct violates public policy and was immoral, unethical, oppressive, and unscrupulous. At the time of Defendants' advertising and sale of the Defective Vehicles, Defendants knew engine immobilizers were effective and that manufacturing and selling vehicles without this industry-standard or equivalent anti-theft technology made the Defective Vehicles unreasonably susceptible to theft and created an unreasonable risk to public safety.

125.    The public policy against the manufacture and sale of cars unreasonably susceptible to theft has been recognized by the NHTSA since the promulgation of the FMVSS in the 1970s and adopted as standard in the United States motor vehicle industry, where nearly all vehicles produced by other manufacturers included engine immobilizers as standard equipment.

126.    Nevertheless, Defendants continued to manufacture and sell Defective Vehicles without industry-standard or equivalent anti-theft equipment and obfuscated critical information regarding the Defective Vehicles, touting those

vehicles as leaders in safety and quality. Defendants continued to market, distribute, and sell Defective Vehicles with deliberate and/or intentional disregard for making any warning, instruction, or other precaution to prevent injuries and/or theft and thereby showed complete indifference to and/or conscious disregard for the safety of others.

127.   Absent a clear and conspicuous disclosure by Defendants, consumers had no reasonable way of learning that the Defective Vehicles lacked industry-standard or equivalent anti-theft technology that made the vehicles demonstrably more susceptible to theft than almost all other vehicles on the market. Defendants' omission and/or obfuscation of this information denied consumers meaningful choice in determining whether to purchase the Defective Vehicles.

128.   The failure of Defendants to include industry-standard or equivalent anti-theft technology also caused substantial injury to consumers. Defendants' actions impacted a substantial number of Chicago consumers. Thousands of Chicago consumers bought Defective Vehicles and had their vehicles stolen and/or totaled. The impact on each consumer was also substantial, with the cost of repairing and/or replacing a vehicle often totaling in the thousands of dollars. Even more Chicago consumers were impacted by having their insurance rates increase. These injuries also disproportionately impacted low-income Chicago consumers.

129.   The wave of thefts of Defective Vehicles in Chicago would have been prevented had Defendants included engine immobilizers or equivalent anti-theft technology.

130.   When thefts of Defective Vehicles spiked, Defendants also failed to take adequate action to both notify consumers of the increased risk and to remove these dangerous vehicles from the market.

131.   As a direct and foreseeable result of Defendants manufacturing and selling unreasonably dangerous vehicles, public safety in Chicago has been imperiled and Chicago has borne the burden to mitigate the damage caused by

-35-

1  Defendants' actions.

2      132.  Defendants also caused substantial injury to consumers. Chicago

3  consumers have been left with Defective Vehicles that are increasingly becoming

4  uninsurable. If those vehicles are stolen, consumers—who are disproportionately

5  low-income—are often stuck continuing to pay a car payment for a stolen or totaled

6  vehicle and paying hundreds if not thousands of dollars to repair their vehicles once

7  recovered.

8      133.  MCC § 2-25-090(h) provides that "[e]ach day that a violation continues

9  or occurred, and each violation committed per day, shall constitute a separate and

10  distinct offense to which a separate fine shall apply." Each day that Defendants

11  engaged and/or engage in unfair trade practices in their selling and failure to warn of

12  the dangers of Defective Vehicles and/or sold and/or sell a Defective Vehicle to a

13  Chicago consumer constitutes a separate and distinct offense of MCC § 2-25-090.

14      134.  WHEREFORE, Chicago respectfully requests that this Court enter an

15  order (a) awarding judgment in the Chicago's favor on its Third Cause of Action;

16  (b) declaring that Defendants have violated MCC § 2-25-090; (c) enjoining

17  Defendants from engaging in further unfair practices in violation of MCC

18  § 2-25-090; (d) awarding restitution for impacted consumers; (e) ordering

19  disgorgement of profits Defendants obtained through their unlawful unfair practices;

20  (f) assessing Defendants fines of $10,000 for each offense under MCC § 2-25-090;

21  (g) awarding Chicago its costs of investigation and suit, including reasonable

22  attorneys' fees and costs; (h) awarding Chicago pre- and post-judgment interest, to

23  the extent allowable; and (i) awarding such other, further, and different relief as this

24  Court deems reasonable and just.

25                          **FOURTH CAUSE OF ACTION**

26                               **Public Nuisance**

27      135.  Chicago incorporates each preceding paragraph as though set forth

28  fully.

136.   At all times relevant to this litigation, Defendants have been the manufacturers, marketers, and/or distributors of the Defective Vehicles being stolen at record rates, and which are being used in the commission of other violent crimes in Chicago.

137.   By designing, manufacturing, and distributing Defective Vehicles, Defendants have created, contributed to, and maintained a public nuisance that unreasonably interferes with a right common to the public.

138.   Defendants knew or should have known that their unlawful conduct has a significant effect on public rights and endangers the safety of the public in Chicago.

139.   Defendants knew that engine immobilizers were effective at preventing theft and included them in vehicles Defendants sold outside the United States. It was foreseeable to Defendants that failing to include engine immobilizers or equivalent anti-theft technology in the Defective Vehicles would result in increased rates of theft of Defective Vehicles and increased costs to Chicago for responding to those thefts and related crimes.

140.   At minimum, Defendants knew or had reason to know that this interference with public safety was a substantially certain outcome of their conduct.

141.   By intentionally foregoing the installation of engine immobilizers or equivalent anti-theft technology in the Defective Vehicles, Defendants directly facilitated the rapid increase in vehicle theft and, with it, created a public nuisance in Chicago.

142.   Chicago and its residents have a common right to be free from conduct that interferes with the peaceful use of public streets, sidewalks, commerce, travel, and the quality of daily life.

143.   Defendants have endangered and harmed the public, undermined law enforcement efforts to deter vehicle theft, and otherwise diverted scarce law enforcement and first responder resources.

144.   Defendants' conduct has directly caused a severe disruption of the public welfare, order, and safety. Defendants' conduct is ongoing and continues to produce permanent and long-lasting damage.

145.   Defendants' conduct substantially interferes with the public's right to safe and reasonable access to public thoroughfares.

146.   Defendants' conduct has affected and continues to affect a substantial number of people within Chicago's community and is likely to continue causing significant harm.

147.   The nuisance created by Defendants' conduct is abatable.

148.   Defendants could have avoided this public nuisance by installing engine immobilizers or equivalent anti-theft technology at the time of manufacture. Defendants acted unreasonably in light of what conduct could be foreseen as a result of their conduct, and Defendants' conduct was a factual and proximate cause of the injuries, harm, and economic losses that Chicago has suffered and will continue to suffer.

149.   As a result of Defendants' conduct, Chicago has suffered and will continue to suffer economic damages, including significant expenditures for police, emergency, health, and other services and has suffered property damage to City property, including City property damaged by stolen Defective Vehicles and property damage on public roads in Chicago. Chicago also has expended and will continue to expend funds on public outreach and theft prevention measures to abate the nuisance. Chicago will continue to incur such damages until the nuisance is abated. These damages are particular to Chicago and are different in kind and degree to the harms suffered by Illinois residents at large.

150.   Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence. Defendants' conduct was with evil motive and/or reckless

1 and outrageous indifference to a highly unreasonable risk of harm and with a
2 conscious indifference to the rights and safety of others.

3      151.   Chicago requests an order providing for abatement of the public
4 nuisance that Defendants have created or assisted in the creation of, including costs
5 for public outreach and theft prevention measures, as well as compensation for
6 economic and property damages and injunctive relief.

7      152.   WHEREFORE, Chicago respectfully requests that this Court enter an
8 order (a) awarding judgment in the Chicago's favor on its Fourth Cause of Action;
9 (b) requiring Defendants to abate the nuisance described herein and to deter and/or
10 prevent the resumption of the nuisance; (c) awarding Chicago damages, including
11 past, present, and future costs incurred by Plaintiff to abate the nuisance described in
12 this Complaint, the amount to be proven at trial; (d) awarding Chicago punitive
13 damages, the amount to be proven at trial; (e) awarding Chicago reasonable
14 attorneys' fees and costs, to the extent allowable; (f) awarding Chicago pre- and
15 post-judgment interest, to the extent allowable; and (g) awarding such other, further,
16 and different relief as this Court deems reasonable and just.

**FIFTH CAUSE OF ACTION**

**Negligence**

19      153.   Chicago incorporates each preceding paragraph as though set forth
20 fully.

21      154.   At all times relevant to this litigation, Defendants had a duty to act as a
22 reasonably careful person would act under the circumstances in the design,
23 manufacture, and distribution of Defendants' products, including the duty to take all
24 reasonable steps necessary to prevent the manufacture and/or sale of a product that
25 was so unreasonably easy to steal.

26      155.   Defendants owed Chicago a duty to not expose the City or its residents
27 to an unreasonable risk of harm. At all times relevant to this litigation, Defendants
28 knew or, in the exercise of reasonable care, should have known, of the hazards and

-39-

dangers of foregoing installation of engine immobilizers or equivalent anti-theft technology in the Defective Vehicles and, specifically, the increased risk of vehicle theft and public harm.

156.   Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that the omission of an engine immobilizer or equivalent anti-theft technology in the Defective Vehicles could cause Chicago injuries and thus created a dangerous and unreasonable risk of injury to Chicago. Defendants were therefore in the best position to protect Chicago against the foreseeable rise in the theft of Defective Vehicles.

157.   Nearly all cars sold in the United States from 2011 to 2022, besides Defendants' Defective Vehicles, were equipped with an engine immobilizer.

158.   As such, Defendants, by action and inaction, breached their duty and failed to exercise reasonable care, and failed to act as a reasonably prudent person and/or company would act under the same circumstances in the design, development, manufacture, testing, and distribution of their vehicles, in that Defendants manufactured and produced vehicles that fell below minimum, industry-standard security measures.

159.   Defendants are in control of the design, research, manufacture, testing, and distribution of the vehicles they distributed to authorized dealerships in Chicago.

160.   Defendants knew and/or should have known that it was foreseeable that Chicago would suffer injuries as a result of Defendants' failure to exercise reasonable care in the manufacturing and sale of Defendants' vehicles, particularly given Defendants' recognition as early as 2007 that engine immobilizers were an effective deterrent in preventing vehicle theft.

161.   Defendants acted unreasonably in light of what could be foreseen as a result of their conduct. Defendants' negligence helped to, produced, and was a factual and proximate cause of the injuries, harm, and economic losses that Chicago

1  suffered, and will continue to suffer.

2      162.  Defendants' acts and omissions imposed an unreasonable risk of harm

3  to others separately and/or combined with the negligent and/or criminal acts of third

4  parties.

5      163.  Chicago's injuries, harms, and economic losses would not have

6  occurred absent Defendants' negligent conduct as described herein.

7      164.  Defendants' conduct constituting reckless disregard of Chicago's

8  rights, was committed and/or authorized by one or more officers, directors, or

9  managing agents of Defendants, who acted on behalf of Defendants. Additionally,

10  or in the alternative, one or more officers, directors, or managing agents of

11  Defendants knew of the conduct constituting reckless disregard of Chicago's rights

12  and adopted or approved that conduct after it occurred.

13      165.  As an actual and proximate result of Defendants' wrongful acts and

14  omissions, Chicago has been injured and has suffered and will continue to suffer

15  economic damages, including significant expenditures for police, emergency, health,

16  and other services and has suffered property damage to City property, including City

17  property damaged by stolen Defective Vehicles and property damage on public

18  roads in Chicago.

19      166.  Chicago has incurred, and will continue to incur, expenditures over and

20  above its ordinary public services. Defendants' misconduct alleged in this case does

21  not concern a discrete event or discrete emergency of the sort a political subdivision

22  would reasonably expect to occur and is not part of the normal and expected costs of

23  a local government's existence.

24      167.  Defendants' willful, knowing, and reckless conduct, constituting

25  reckless disregard of Chicago's rights, including the right to public safety.

26  Defendants' conduct was with evil motive and/or reckless and outrageous

27  indifference to a highly unreasonable risk of harm and with a conscious indifference

28  to the rights and safety of others.

-41-

168.    Chicago is without fault and injuries to Chicago and its residents would not have occurred in the ordinary course of events had Defendants used due care commensurate to the dangers involved in the manufacturing and distribution of their vehicles.

169.    WHEREFORE, Chicago respectfully requests that this Court enter an order (a) awarding judgment in Chicago's favor on its Fifth Cause of Action; (b) awarding Chicago damages as permitted by law, the amount to be proven at trial; (c) awarding Chicago punitive damages as permitted by law; (d) awarding Chicago reasonable attorneys' fees and costs, to the extent allowable; (e) awarding Chicago pre- and post-judgment interest, to the extent allowable; and (f) awarding such other, further, and different relief as this Court deems reasonable and just.

## SIXTH CAUSE OF ACTION

### Violation of MCC § 1-20-020

170.    Chicago incorporates each preceding paragraph as though set forth fully herein.

171.    MCC § 1-20-020 provides that "[a]ny person who causes the city or its agents to incur costs in order to provide services reasonably related to such person's violation of any federal, state or local law, or such person's failure to correct conditions which violate any federal, state or local law when such person was under a legal duty to do so, shall be liable to the city for those costs."

172.    The MCC defines "costs" as:

all costs of the city incurred in relation to the provision of services by the city or its agents, regardless of whether the city would have otherwise incurred those costs, including but not limited to wages and benefits of personnel involved in providing such services, reasonable costs of equipment used in the provision of such services, costs of materials expended in providing such services, costs of storing

-42-

hazardous or any other materials recovered during the course of
providing such services, or any other costs allocable to the provision of
services.

MCC § 1-20-010.

173.    Chicago is also entitled to recover a penalty in an amount equal to the
City's litigation and collection costs and attorneys' fees. MCC § 1-20-060.

174.    Defendants have acted in violation of federal, state, and local law by
using deceptive and unfair trade practices in violation of MCC §§ 2-25-090 and
4-276-470; 815 ILCS 505/2 and 510/2; and 15 U.S.C. § 45. Defendants have also
acted in violation of state common law through their negligent manufacture and sale
of Defective Vehicles and their cause of or contribution to a public nuisance.

175.    The direct and proximate result of Defendants' violation of federal,
state and/or local law was a wave of thefts of the Defective Vehicles, and the
resulting costs to Chicago in responding to the wave of thefts and crimes, injuries,
and property damage associated with those thefts.

176.    Had Defendants not unlawfully misrepresented the quality and safety of
the Defective Vehicles in their advertising and marketing materials, including by
intentionally omitting information about the lack of engine immobilizers or
equivalent technology, some, if not all, of Chicago consumers would not have
bought the Defective Vehicles, resulting in fewer cars on the streets to steal.
Additionally, had Defendants not unfairly marketed and sold the Defective Vehicles
and/or negligently manufactured vehicles without industry-standard antitheft
technology, the Defective Vehicles would not have been on the street at all or
otherwise without the anti-theft technology that makes them unusually susceptible to
theft.

177.    Defendants' misconduct alleged in this case does not concern a discrete
event or discrete emergency of the sort a political subdivision would reasonably

-43-

expect to occur and is not part of the normal and expected costs of a local government's existence

178.   Because of Defendants' unlawful actions, the City of Chicago has had to expend, and will continue to expend, considerable resources to mitigate the harms from thefts of these vehicles and related crimes. The City of Chicago has incurred and will continue to incur costs for police, emergency, health, and other services; costs to repair property damage; and costs for public outreach and theft prevention measures to mitigate the nuisance caused by Defendants.

179.   WHEREFORE, Chicago respectfully requests that this Court enter an order (a) awarding judgment in the Chicago's favor on its Sixth Cause of Action; (b) awarding Chicago costs it has incurred and will continue to incur due to Defendants violation of law as provided in MCC § 1-20-020, in the amount to be proven at trial; (c) awarding Chicago its costs of investigation and suit, including reasonable attorneys' fees and costs as a penalty under MCC § 1-20-020; (d) awarding Chicago pre- and post-judgment interest, to the extent allowable; and (e) awarding such other, further, and different relief as this Court deems reasonable and just.

## PRAYER FOR RELIEF

Plaintiff City of Chicago respectfully requests that the Court enter an order granting the following relief:

A.   Declaring that Defendants violated MCC § 2-25-090;

B.   Declaring that Defendants violated MCC § 4-276-470;

C.   Enjoining Defendants from engaging in further unfair and deceptive practices in violation of MCC § 2-25-090;

D.   Enjoining Defendants from engaging in further deceptive practices in violation of MCC § 4-276-470;

E.   Entering an injunction requiring Defendants to abate the nuisance described herein and to deter and/or prevent the resumption of the nuisance;

-44-

F.   Awarding restitution to impacted consumers due to Defendants' unfair and deceptive practices in violation of MCC § 2-25-090;

G.   Disgorging Defendants of their profits obtained through unfair and deceptive practices in violation of MCC § 2-25-090;

H.   Assessing Defendants fines of $10,000 for each offense under MCC § 2-25-090;

I.   Assessing Defendants fines of $2,000 for each offense under MCC § 4-276-470;

J.   Awarding Chicago costs incurred from Defendants' conduct, pursuant MCC § 1-20-060;

K.   Awarding Chicago past, present, and future costs to abate the nuisance described in this Complaint;

L.   Awarding Chicago all other damages permitted by law;

M.   Awarding Chicago punitive damages permitted by law;

N.   Awarding Chicago its costs of investigation and suit, including reasonable attorneys' fees and costs as a penalty under MCC § 1-20-020;

O.   Awarding Chicago reasonable attorneys' fees and costs, to the extent allowable;

P.   Awarding Chicago pre- and post-judgment interest, to the extent allowable; and

Q.   Awarding such other, further, and different relief as this Court deems reasonable and just.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all claims so triable.

1

2

3

4

5    Date: April 10, 2024

6

7

8

9

10

11

12

13

14

15

16    Date: April 10, 2024

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

**CITY OF CHICAGO DEPARTMENT OF LAW**

By: */s/Stephen J. Kane*

Stephen J. Kane (*pro hac vice*)
CITY OF CHICAGO DEPARTMENT OF LAW
AFFIRMATIVE LITIGATION DIVISION
121 North LaSalle Street, Room 600
Chicago, Illinois 60602
Tel: 312.744.6934

Jimmy Rock (*pro hac vice*)
EDELSON PC
jrock@edelson.com
1255 Union Street NE, 7th Floor
Washington, DC 20002
Tel: 202.270.4777

By: */s/Shantel Chapple Knowlton*

Shantel Chapple Knowlton (*pro hac vice*)
EDELSON PC
schappleknowlton@edelson.com
350 North LaSalle Street, 14th Floor,
Chicago, Illinois 60654
Tel: 312.589.6370

*Attorneys for Plaintiff City of Chicago*

-46-

**CERTIFICATE OF SERVICE**

I hereby certify that on April 10, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record. In addition, a Notice of Filing of Second Amended Complaint is being filed concurrently in the MDL attaching the Second Amended Complaint and Exhibits A-C thereto and will send notification of such filing to all counsel of record in the MDL

*/s/ Shantel Chapple Knowlton*